# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 0: 17-cr-00168-SRN-KMM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Kalil Wesley Dunn, | |
| Defendant. | |

Thomas Calhoun-Lopez, United States Attorney's Office, 300 S 4th Street, Suite 600, Minneapolis, MN, 55415, counsel for plaintiff

Robert M. Paule, Robert M. Paule, PA, 920 Second Avenue South, Suite 975, Minneapolis, MN, 55402, counsel for defendant

The defendant, Kalil Wesley Dunn, filed nine motions in this matter and the Court conducted a hearing on those motions on September 12, 2017. Min., ECF No. 27. The Court issued a brief order addressing six of the motions and took the remaining three motions under advisement. Ord., ECF No. 29. The Court now considers these outstanding motions.

Mr. Dunn asks that this Court sever the first three counts from the remainder of the indictment. Def.'s Mot. for Severance, ECF No. 20. Mr. Dunn also challenges the seizure of evidence during two motor-vehicle searches as lacking legal basis. Def.'s Mot. to Suppress Evid., ECF No. 21. Finally, Mr. Dunn challenges "[a]ny and all statements, admissions and answers" he made to law enforcement on April 12, 2017 and June 20, 2017 "on the grounds that they are 'fruit of the poisonous tree' following from the illegal search[es] of his motor vehicle and subsequent arrest[s]." Def.'s Mot. to Suppress Statements, ECF No. 22. For the reasons set forth below, the Court recommends that all three motions be denied.

## FACTS

The charges against Mr. Dunn arose out of two separate encounters between Mr. Dunn and law enforcement officers: one on April 12, 2017 and one on June 20, 2017.

**April 12, 2017**

On April 12, 2017, Minneapolis Police Officer Richard Knoche and his partner, Officer Schroeder, were on routine patrol when they received a call regarding a four-car accident in Minneapolis around 1:00 AM. Mot. Hrg. Tr. at 13-15, ECF No. 32. A witness on the scene told Officer Schroeder that Mr. Dunn's Buick car ran into three parked cars before spinning to a stop, blocking and facing oncoming traffic. *Id.* at 16-17; *see also* Gov't Ex. 1 (depicting the scene upon the officers' arrival). Mr. Dunn was standing outside of his car upon the officers' arrival. Mot. Hrg. Tr. at 27.

Officer Schroeder instructed Officer Knoche to detain Mr. Dunn, with whom Officer Schroeder had had prior contacts. *Id.* at 23. Officer Knoche testified that Mr. Dunn was intoxicated, slurring his words, struggling to communicate, and swaying on his feet. *Id.* Though Officer Knoche activated his body camera during this interaction, it does not depict Mr. Dunn very clearly. *See* Gov't Ex. 6. To the extent that the footage does depict Mr. Dunn, it does not plainly support the allegation that Mr. Dunn was slurring his speech or struggling to communicate. *See id.* Officer Knoche also testified that Mr. Dunn struggled to formulate sentences when the officer inquired about Mr. Dunn's potential need for medical care, but his body camera footage did not capture this interaction. Mot. Hrg. Tr. at 28. Officer Knoche did not memorialize his observations as to Mr. Dunn's intoxication in the police report he prepared about the property damage. *Id.* at 27, 31. He determined that documenting his beliefs about Mr. Dunn's drunkenness was not necessary because he did not pursue any intoxication-related charges against Mr. Dunn. *Id.* at 31. Mr. Dunn denies that he was intoxicated, instead contending that he had fallen asleep while driving. *Id.* at 125-26.

Because Mr. Dunn's car was blocking traffic and had sustained sufficient damage to seem unmovable, the officers decided to tow it pursuant to Minneapolis Police Department policy. Mot. Hrg. Tr. at 17-18; *see also* Gov't Ex. 3 (Minneapolis Police Department Policy as to Vehicle Impounding and Towing). Mr. Dunn had

already contacted a towing company to arrange a tow of his vehicle, but Minneapolis Police Department policy does not require police to inquire as to a driver's desire to make his own arrangements for vehicle removal prior to impoundment. Mot. Hrg. Tr. at 43, 128; Gov't Ex. 3 at 7-701(D). Before impounding the car, the officers conducted an inventory search pursuant to department policy. Mot. Hrg. Tr. at 18-19; Gov't Ex. 3 at 7-702. In that search, the officers recovered a Sig Sauer 9-millimeter handgun, a Kel-Tec .22 handgun with a laser sight, two bags of suspected crack cocaine, two digital scales, and two cell phones. Mot. Hrg. Tr. at 19; Gov't Ex. 4.

Minneapolis Police Officer Danielle Evans spoke with Mr. Dunn at Hennepin County Jail approximately eight hours after his arrest. Mot. Hrg. Tr. at 46-47. Before interviewing Mr. Dunn, Officer Evans advised him of his rights and Mr. Dunn indicated his understanding. *Id.* at 49-50; *see also* Gov't Ex. 7. The entire interview was recorded. Gov't Ex. 7.

**June 20, 2017**

On June 20, 2017, Minneapolis Police Officer Donnell Crayton and his partner, Officer Kong Moua, were on routine patrol in their vehicle around 6:25 PM. Mot. Hrg. Tr. at 54-55. Officer Crayton saw Mr. Dunn drive past him and his partner in a silver Toyota Scion car and make eye contact as he did so. *Id.* at 55-56. Officer Crayton recognized Mr. Dunn from previous encounters. *Id.* at 55. Officer Crayton believed that Mr. Dunn sped away from the officers after passing them. *Id.* at 57.

The officers turned around to follow Mr. Dunn and had to speed to catch up with him. *Id.* at 57-58. Officer Crayton observed traffic violations of speeding and failure to properly indicate multiple turns, and testified that there were children playing in the neighborhood. *Id.* at 58-59, 80. After a few blocks of pursuit, the officer activated his lights as a result of Mr. Dunn's reckless driving and Mr. Dunn pulled over. *Id.* at 61-62, 80. Mr. Dunn parked the car, got out, and began walking away. *Id.* at 61-62. Officer Crayton instructed Mr. Dunn to stop, put his hands up, and walk toward the squad, but Mr. Dunn was "slow to follow those commands." *Id.* at 62. Before following any commands, Mr. Dunn appeared to reach behind his back. *Id.* Given Mr. Dunn's lack of prompt cooperation, the possibility that he was armed, and the potential that he would flee, Officer Crayton detained him in handcuffs. *Id.* at 62, 84-85.

After Mr. Dunn had pulled over and exited the vehicle, Officer Moua "walked up to the vehicle to make sure nobody else was inside." *Id.* at 92. Though he did not see another person, Officer Moua "observed a plastic bag containing what appeared to be crack cocaine" with a lighter next to it through the driver's side window. *Id.*; *see also* Gov't Ex. 8. Based on his training and experience, Officer Moua recognized the crack cocaine through the window and retrieved the key for the car. Mot. Hrg. Tr. at 93-95. He then initiated a search of the car and located what appeared to be a Glock pistol with a magazine and a magazine drum. *Id.* at 96-98; *see also* Gov't Exs. 9, 10, 12, 13. Although Officer Moua took photographs of the evidence found during the search, including the gun and the drugs, he did not take those photographs in the order in which the items were discovered. Mot. Hrg. Tr. at 113-14. He agreed that he photographed and collected the weapon and ammunition first because "drugs didn't endanger anyone if [he] were to leave them there." *Id.* at 114.

Mr. Dunn was subsequently taken to Hennepin County Jail. *Id.* at 116. Minneapolis Police Officer Adam Lepinski and ATF Special Agent Bryan Lervoog interviewed Mr. Dunn at the Hennepin County Jail two days after his arrest. *Id.* at 115-16. The interview was recorded. *Id.* at 117; *see also* Gov't Ex. 15. Officer Lepinski began the interview by advising Mr. Dunn of his rights, and Mr. Dunn indicated that he understood. Mot. Hrg. Tr. at 117; Gov't Ex. 15.

## I.     The April 12 Car Search

Mr. Dunn first argues that the evidence seized as a result of the April 12 search of his car must be suppressed. Def.'s Mot. to Suppress Evid.; Def.'s Mem. at 2-3. He notes that testimony at the evidentiary hearing suggested two potential legal grounds for this search: search incident to a lawful arrest for driving while intoxicated and search pursuant to the police department's towing policy. Def.'s Mem. at 2. However, the government only seriously relies upon the latter exception to the warrant requirement in defense of the search, so the Court need not explore whether the search incident to arrest exception applies.[1]

---

[1] Mr. Dunn argues with some persuasiveness that the evidence, described above, does not support a finding that he was intoxicated, and the Court notes that he was neither arrested for nor charged with driving under the influence. Def.'s Mem. at 2-3. Were the government to rely upon this exception to the warrant requirement to support the

-4-

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412 (1978)). The inventory exception to the warrant requirement of the Fourth Amendment "allows law enforcement to inventory the contents of a lawfully impounded vehicle without a warrant or probable cause." *Id.*

An inventory search of a car must "be reasonable under the totality of the circumstances," and this requirement is satisfied when such a search is "conducted according to standardized police procedures." *Id.* This serves to "remove the inference" that the police used the search as a pretext to rummage for incriminating evidence. *Id.* (quotation omitted). The government bears the burden establishing the applicability of the inventory exception. *Id.* The "'authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.'" *United States v. Harris*, 795 F.3d 820, 822 (8th Cir. 2015) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369, 371, 96 S.Ct. 3092, 3097, 3098 (1976)).

Against this backdrop, it is clear that Officer Knoche's decision to tow the car was valid, and the subsequent search was lawful. First, the search was conducted in accordance with police department policy. The Minneapolis Police Department Vehicle Impound and Towing Policy allows officers to, in their discretion, impound a vehicle when it "impedes traffic, threatens public safety, or threatens public convenience and the owner/driver cannot immediately remove the vehicle on his/her own." Gov't Ex. 3 at 7-701. The policy specifically notes that officers "are not required to ask an owner/driver if he/she wishes to make his/her own arrangements for the removal of the vehicle in lieu of impoundment." *Id.* at 7-701(D). And the policy requires that, "[p]rior to removal by the towing service, the vehicle shall be searched" according to the department policy on vehicle searches. *Id.* at 7-702.

---

April 12 search, it would need to do more than mention the issue in passing. *See* Gov't's Resp. at 9 n.6, ECF No. 36.

Here, as Officer Knoche testified and as the photograph of the car demonstrates, the car had sustained significant damage to its front end and had a flat tire. Mot. Hrg. Tr. at 32; Gov't Ex. 2. Moreover, the damaged car was blocking traffic because it was in a driving lane and facing the wrong way. Mot. Hrg. Tr. at 32; Gov't Ex. 1. Mr. Dunn does not refute either fact, and both place Officer Knoche's decision to tow the car squarely within the department's policy.

Mr. Dunn argues that the officers should have asked him if he wanted to make his own arrangements for the removal of the car. Not only does the policy specify that officers are not required to do so, but Mr. Dunn points to no authority for the idea that the Fourth Amendment requires law enforcement to offer such options in circumstances such as these.

Finally, there is no suggestion that the inventory search which was ultimately conducted in advance of the towing of the car violated either the Department's policy or the permissible scope of an inventory search generally. *See, e.g., United States v. Wilson*, 636 F.2d 1161, 1163 (8th Cir 1980) (weighing the interests underlying the justification of inventory searches against the privacy interests invaded to determine the reasonableness of a search's scope).

Given the clearly established authority of police to remove a vehicle that impedes traffic and threatens public safety and convenience, like Mr. Dunn's did here, and the likewise clear authority of police to conduct an inventory search of such a vehicle, the Court concludes that the evidence seized during the April 12 search is not subject to suppression.

## II.   The June 20 Car Search

Mr. Dunn also challenges the evidence recovered as a result of the search of his car on June 20. Def.'s Mot. to Suppress Evid.; Def.'s Mem. at 3-5. He first implies without argument that the police had no basis for the stop. Def.'s Mem. at 3-4. He does not provide evidence in support of this assertion and no testimony contradicts that Mr. Dunn was speeding and failed to signal multiple turns. There is a clear legal basis for the stop.

Mr. Dunn next contends that the search was invalid, arguing that this search did not follow a lawful custodial arrest and was not conducted pursuant to established administrative procedures so the resulting evidence must be suppressed. *Id.* at 5. But

the record demonstrates that this search was justified by Officer Moua's observation of suspected crack cocaine in plain view through the window of the car Mr. Dunn had just vacated. Mot. Hrg. Tr. at 92. The Court finds that the automobile exception to the warrant requirement permitted a search of the car upon Officer Moua's discovery of the crack cocaine.

### Plain View

It is well established that, "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 2137 (1993). If an item's incriminating character is immediately apparent, this plain view doctrine permits its seizure. *Id.*

Officer Moua testified that he and his colleague stopped Mr. Dunn for multiple minor traffic violations which they observed. Mot. Hrg. Tr. at 105. Mr. Dunn does not refute this testimony. *See* Def.'s Mem. at 4. Therefore, the first requirement of the plain view exception to the warrant requirement is met: Officer Moua was lawfully walking around the car he had just pulled over for a traffic violation at the time he observed the crack cocaine.

Officer Moua also testified that, while looking in the window, he saw in plain view a substance which he reasonably believed was crack cocaine. Mot. Hrg. Tr. at 58-59, 80, 92. The Eighth Circuit has previously held that drug paraphernalia immediately apparent through a car's window justified a search of the car, and the resulting evidence was not obtained in violation of the Fourth Amendment. *United States v. Reinholz*, 245 F.3d 765, 777 (8th Cir. 2001). The same is clearly true here.

Mr. Dunn's primary challenge to the applicability of the plain view doctrine is that, contrary to his sworn testimony, Officer Moua began the search before seeing the crack cocaine and therefore had no legal justification for entering the vehicle. Def.'s Mem. at 4-5. In support of this argument, Mr. Dunn emphasizes that Officer Moua first photographed and collected the firearm and ammunition before doing the same to the suspected drugs. *Id.* He implies that had the narcotics actually been seen through the window, they would have been photographed first and collected first, rather than as an afterthought, and he suggests that police policy requires items to be

photographed and taken into custody in the order of their discovery. *See id.* This argument is unpersuasive.

First, Officer Moua directly and credibly testified that he saw what appeared to be crack cocaine through the driver's side window and therefore decided to search the vehicle. Mot. Hrg. Tr. at 92, 95. This testimony was corroborated by Officer Crayton, who testified that his partner "said he observed narcotics in the vehicle, and then he located a firearm later." *Id.* at 63. Additionally, a photograph submitted by the government supports a finding that the contraband would have been clearly visible through the driver's side window of Mr. Dunn's vehicle. Gov't Ex. 8. Although footage from Officer Moua's body camera does not clearly depict whether the drugs were visible through the window, the footage and the squad video both corroborate Officer Moua's narrative that he saw the drugs through the driver's side window, retrieved the key, and initiated search of the vehicle. *See* Def.'s Ex. 1.

Moreover, though Officer Moua admitted that he photographed and collected the firearm and magazine first, he also testified that there is no particular policy dictating in what order officers must search cars. *Id.* at 109, 112-13. He even explained his decision regarding the order of documenting and collecting the evidence, suggesting that safety concerns support securing a firearm before drugs. *Id.* at 114. In sum, Mr. Dunn has not persuaded the Court that Officer Moua testified untruthfully when he described the discovery of the crack cocaine through the car window. And based upon the clear record on this matter, Officer Moua's entry into the car to seize the drugs in the front seat was lawful under the plain view doctrine.

**Automobile Exception**

Following the discovery of the drugs, the subsequent search of the car was justified by the automobile exception to the warrant requirement of the Fourth Amendment: the narcotics in the front seat gave rise to probable cause that other parts of the car would contain evidence or contraband as well.

"As long as law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000). Officers have probable cause where a totality of the circumstances would support a reasonable person's belief that "there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Id.* When drugs are plainly visible through the window of a vehicle,

officers generally have a substantial basis to believe that further contraband or evidence may be in the car and thus have probable cause to search for drugs or drug-related contraband. *See id.* at 1085-86; *United States v. Hatley*, 14-CR-202 (MJD/JSM), 2014 WL 5286355, at *3-4 (D. Minn. Sept. 8, 2014.).

For these reasons, the Court concludes that the evidence discovered as a result of the June 20 search of Mr. Dunn's car was lawfully obtained pursuant to the plain view and automobile exceptions to the warrant requirement of the Fourth Amendment. This evidence therefore need not be suppressed.

## III. Statements

Mr. Dunn filed a motion to suppress statements, admissions, and answers he made on April 12, 2017 and June 20, 2017 as fruit of the poisonous tree "following from the illegal search[es] of his motor vehicle and subsequent arrest[s]." Mot. to Supp. Statements. But because the Court has already determined that the challenged searches of Mr. Dunn's cars were both legal, the statements are not suppressible as poisonous fruit. Moreover, Mr. Dunn's statements to Officer Evans, Officer Lepinski, and Special Agent Lervoog were made following valid rights advisories in accordance with the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). Mot. Hrg. Tr. at 49-50, 117; Gov't Exs. 7, 15. Mr. Dunn does not argue that his *Miranda* waivers were invalid as a result of intimidation, coercion, or deception, nor does he argue that he was otherwise unable to understand his rights before choosing to speak with officers. This Court sees no justification for suppressing any statements made following either of Mr. Dunn's arrests.

## IV. Motion for Severance

Finally, Mr. Dunn argues that the Court should "sever Count 4 of the indictment from the other counts at trial due to prejudice that the jury might use evidence of this count to infer guilt on the other counts, or that the jury might cumulate the evidence to find guilt as to all crimes."[2] Def.'s Mem. at 5; *see also* Def.'s Mot. for Severance. His subsequent argument is brief and reads as follows:

---

[2] Mr. Dunn does not specifically address count 5 of the indictment in his motion. The count relates to activity on the same date as that in count 4. The Court therefore assumes that Mr. Dunn seeks severance of counts 4 and 5 from counts 1 through 3 for the purposes of this Order.

> Although under Fed. R. Crim. P. 8 multiple counts can be joined at trial if they are of the same or similar character, *United States v. Kirk*, 528 F.3d 1102 (8th Cir. 2008), particularly if evidence of one count would be admissible in the trial of the other counts, *United States v. Taken Alive*, 513 F. 3d 899 (8th Cir. 2008), this is inapplicable in the instant case. Here the Defendant will likely wish to testify at trial on Counts 1-3, but would choose not to do so if evidence regarding Count 4 would be admissible. *Cross v. United States*, 335 F. 2d 987 (D.C Cir. 1964). Therefore, the Court should grant the Motion to Sever to avoid prejudice against the Defendant at trial.

Def.'s Mem. at 5-6. Count 1 alleges that Mr. Dunn possessed firearms despite his ineligibility to do so, count 2 alleges that Mr. Dunn possessed cocaine base with intent to distribute, and count 3 alleges that he possessed firearms in relation to a drug trafficking crime, all on April 12, 2017. Indictment at 1-2, ECF No. 10. Count 4 charges Mr. Dunn with possessing a firearm despite his ineligibility to do so on June 20, 2017 and count 5 alleges that he possessed cocaine base with intent to distribute on that same date. *Id.* at 2-3. The government responds that Mr. Dunn failed to make the required "'persuasive and detailed showing regarding the testimony he would give on the one count he wishes severed and the reason he cannot testify on the other counts.'" Gov't's Resp. at 14 (quoting *United States v. Possick*, 849 F.2d 332, 338 (8th Cir. 1988)). The Court agrees with the government.

In *United States v. Perrin*, the Court found that the defendant had failed to satisfy the requirement for a detailed factual showing in support of his motion for severance. 17-CR-26 (WMW/DTS), 2017 WL 3278935, at *4-5 (D. Minn. May 2, 2017). The defendant in that case argued that he wanted to present a defense through his own testimony on one count, but that he did not wish to expose himself to cross-examination regarding another count. *Id.*, at *4. The Court found this an insufficient showing, noting that the defendant must demonstrate that "he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Id.*, at *5 (quotation omitted). Here, Mr. Dunn has given even less factual support than the defendant in *Perrin* to bolster his motion for severance, indicating only that he "will likely wish to testify" on Counts 1 through 3 and "would choose not to do so" if the remaining counts were not severed. Def.'s Mem. at 6. This minimal

-10-

showing clearly does not satisfy Mr. Dunn's burden, and the counts need not be severed.

However, the Court recommends that this Motion be denied without prejudice. Motions for severance are often made closer to trial, when conflicts between defenses or confrontation clause problems become more apparent.  In this case, while Mr. Dunn has not yet made the required showing, if preparations for trial reveal a new and stronger basis for severance, Mr. Dunn should be permitted to raise the issue again as long as he does so sufficiently ahead of trial.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. The defendant's Motion to Sever Counts (**ECF No. 20**) should be **DENIED without prejudice**;
2. The defendant's Motion to Suppress Evidence (**ECF No. 21**) should be **DENIED with prejudice**; and
3. The defendant's Motion to Suppress (**ECF No. 22**) should be **DENIED with prejudice**.

Date: November 30, 2017           *s/ Katherine Menendez*
                                  Katherine Menendez
                                  United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the

-12-

objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.